UNITED STATES of America, Plaintiff,

v.

Ronald Napoleon WOLFE,
Sr., Defendant.

No. Crim. 97–50065.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 1, 1998.

Saul Green, United States Attorney, by Mark C. Jones, Assistant United States Attorney, Flint, MI, for Plaintiff.

Kenneth G. McIntyre, Sinas Dramis, Lansing, MI, Donald E. Martin, Lansing, MI, for Defendant.

### MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS FRUITS OF A STATE SEARCH WARRANT

GADOLA, District Judge.

Defendant has filed a motion to suppress the fruits of a state search warrant. Evidentiary hearings were held on the instant motion on July 30, July 31, and August 24, 1998. For the reasons set forth below, defendant's motion to suppress fruits of a state search warrant will be denied.

### FACTUAL BACKGROUND

The search warrant at issue in the case at bar was based on a six-page affidavit prepared on December 19, 1996 by Daniel Garber, Chief Assistant Prosecutor for Livingston County. It was signed on December 23, 1996 by Detective Allan Perry, who was during the relevant time period, a Deputy with the Livingston County Sheriff's Department. Perry was engaged in an investigation of various larceny and fraud crimes in which the defendant and others were suspects.

Judge Michael K. Hegarty of the 53rd District Court for the State of Michigan issued the search warrant. It authorized a search of the defendant's entire premises in Howell, Michigan, including:

the residence and outbuildings commonly referred to as 5753 Fisher Road; said premises include[ ] a multi story log construction residence located on the west side of Fisher Road in Section 1 of Howell Township, Livingston County, a gray barn with a brown roof having living quarters in the upper story that is located South of the log constructed residence, a new pole barn with a dark shingled roof and OSB siding located southeast of the log constructed residence and a gray airplane hangar structure with a steel roof located north/northeast of the log constructed residence.

The property to be searched for and seized pursuant to the warrant included the following items:

[d]ocuments or evidence indicative of the ownership or occupancy of the above premises; insurance records including contracts, claim forms and payment forms; bales of hay; golf carts; records relating to building materials for the structures on the premises; shingle samples; building material samples; photographs; records relating to the purchase, ownership or registration of firearms; records relating to the possession, ownership or registration of vehicles, records or evidence relating to horse ownership, sales or veterinary treatment.

On December 23, 1996, officers from the Livingston County Sheriff's Department, Michigan State Police and Brighton State Police went to defendant's premises to assist in the entry of the premises and/or execution of the warrant. After entering the house, defendant was arrested. His wife, Marie Wolfe, was given a copy of the search warrant to review.

During the execution of the warrant, Perry went to the basement of defendant's residence where Perry located a large (approximately 10 feet by 17 feet) locked vault concealed behind a moveable shelf unit. Perry knew about this vault prior to the search. Officers asked defendant's wife for the combination to the vault. Marie Wolfe did not assist the officers, so they called the defendant. Defendant by that time had been arrested and taken from his home to the Livingston County Jail. Defendant provided the officers with the combination to the vault's

door, after being denied the opportunity to consult with an attorney over the matter.

In the vault, the officers found and seized a long "plant growing light," a water pump, electric timers, a humidity gauge, 8 plastic pots and 17 marijuana growing plants. Also inside the vault the officers found scores of firearms. After locating receipts for only twelve weapons, the officers seized 86 firearms.

The guns seized on December 23, 1998 were later examined by the Federal Bureau of Alcohol, Tobacco, and Firearms (hereinafter "Bureau of ATF" or "ATF") which reported that they included: at least 13 unregistered automatic weapons; one unregistered sawed-off rifle; two unregistered pen guns; three unregistered silencers; and two stolen firearms.

Defendant, who is a Class III federally-licensed firearms dealer, ultimately was charged in federal court with 21 counts of firearms charges, including 18 counts of possession of unregistered firearms in violation of 26 U.S.C. § 5861(d), one count of possession of a short-barreled rifle in violation of 26 U.S.C. § 5861(d), one count of possession of a stolen firearm in violation of 18 U.S.C. § 922(j), and one count of failure to record a firearm transaction in violation of 18 U.S.C. § 922(m).[1]

Presently before this Court is defendant's motion to suppress the fruits of the state search warrant. Specifically, defendant seeks suppression of the firearms upon which the charges in the present indictment are based.

### ANALYSIS

Defendant raises a host of arguments in support of his motion to suppress the firearms. These include assertions that:

1. the affidavit was not properly sworn to by Detective Perry;

2. the affidavit contained false or misleading assertions of material fact;

3. the affidavit was not sufficient to support a finding of probable cause because it did not provide the magistrate with any basis for evaluating the credibility of the informants and did not allege any facts tending to establish the evidence of wrongdoing in the defendant's home;

4. the good faith exception to the warrant requirement is not applicable here because the magistrate acted as a "rubber-stamp" for the police and because the officers who executed the warrant did not rely in "good faith" on the warrant;

5. the search of the vault and seizure of the firearms were not otherwise valid absent a warrant since defendant did not voluntarily consent to the search of the vault;

6. seizure of the firearms was improper because the warrant did not provide for seizure of such items and because the plain view exception to the warrant requirement is inapplicable; and

7. M.C.L. § 780.656, "Breaking of doors and windows," was violated.

Each of these arguments will be analyzed and discussed *seriatim.*

### 1. DETECTIVE PERRY PROPERLY SWORE TO THE AFFIDAVIT.

Defendant contends that the search violated the Fourth Amendment since Detective Perry allegedly never swore to the document which provided the basis for Judge Hegarty's issuance of the search warrant. The Fourth Amendment specifically requires that "no Warrants shall issue, but upon probable cause, *supported by Oath or affirmation.*" U.S. Const., Amdt. 4 (emphasis added).

■ This Court finds that defendant has not met his burden of proving that Detective Perry was not duly sworn by Judge Hegarty. The Court is satisfied that Detective Perry attested to the truth of the contents of the "Affidavit For Search Warrant" in a *telephone call* to Judge Hegarty on the morning

---

1. Defendant was also charged in Livingston County Circuit Court with state crimes pertain-

ing to stolen goods and marijuana.

of December 23, 1996, prior to the time Judge Hegarty issued the search warrant. Telephonic oaths are permissible under Michigan law. *See* M.C.L. § 780.651; *People v. Snyder*, 181 Mich.App. 768, 772–74, 449 N.W.2d 703 (1989) (interpreting M.C.L. § 780.651 and holding that oath required to be taken by police officer requesting search warrant was not required to occur within presence of issuing judge, but could be given over the telephone).

■ Perry testified in this Court on July 30, 1998, that, although he does not have any independent recollection of the event, he believes that he called Judge Hegarty during the early morning hours of December 23, 1996. Perry testified that Judge Hegarty's procedure was to instruct Perry to raise his right hand and attest to the contents of the "Affidavit for Search Warrant" over the telephone. After taking the oath over the telephone, the affidavit and search warrant would either be faxed or delivered to Judge Hegarty for his signature. In this instance, Perry is convinced that the affidavit was delivered to Judge Hegarty for his signature, since Judge Hegarty's fax machine was broken.

Previously, when examined on this precise issue in state court, Perry testified that he personally swore to the affidavit at Judge Hegarty's residence in Hartland, Michigan on the morning of December 23, 1996. The Court does not find this contrary testimony to be accurate. Perry's current testimony was very credible. This Court is satisfied that Perry made a mistake when he testified earlier in state court that he personally took the affidavit to Judge Hegarty's home on December 23, 1996. Perry admitted that the reason he had earlier testified differently was that he was confusing the affidavit and warrant at issue with another affidavit and search warrant (possibly one for a trailer park on Grand River). The Court finds such an explanation plausible. The event at issue took place over two years ago and it is understandable that Perry's memory was not clear on this issue. In fact, Judge Hegarty conceded during his testimony on March 18, 1996 that his memory as to what transpired on December 23, 1996 was "hazy" as well,

and that he, like Perry, could not recall whether Perry had been in his living room on December 23, 1996 and given the oath in person. Judge Hegarty recalled that Perry was in his living room on one occasion and that all the occasions "kinda blend together." Testimony of Judge Hegarty, March 18, 1996, p. 26.

Moreover, Perry's most recent version of the events is corroborated by the testimony of Deputies James Bolling and Michael Hawry. On March 11, 1998, these two deputies testified that they, not Detective Perry, took the affidavit to the home of Judge Hegarty, on Hope Lake in Brighton Township, on the morning of December 23, 1996. Although they offered different versions of why Perry asked to hand-deliver the affidavit to Judge Hegarty as opposed to faxing it, (Deputy Bolling testified that the affidavit and search warrant could not be faxed since the fax machine was broken and Deputy Hawry testified that the affidavit and search warrant could not be faxed because they were too long), both verified that it was Perry who requested that the affidavit and search warrant be delivered. Furthermore, the log books confirm that Deputies Bolling and Hawry, and not Perry, delivered the search warrant to Judge Hegarty.

The testimony of Judge Hegarty also convinces this Court that Perry was properly given an oath. Judge Hegarty testified that a telephone call would always be placed to him before an affidavit and search warrant were delivered to his home. *See* Testimony of J. Hegarty, March 18, 1998, p. 28. In fact, Judge Hegarty indicated that no police officer in their right mind would come to his residence early in the morning without alerting him, first, by telephone. Thus, Perry must have placed the call before the deputies took the warrant to the Judge's home. Judge Hegarty also testified that he never would have signed the search warrant without first swearing Allan Perry, and thus he must have given Perry an oath during the phone call. *See* Testimony of J. Hegarty, March 18, 1998, p. 59. Judge Hegarty also testified that it was common practice to give oaths over the phone and that if he initially forgot, he would soon remember and rectify

the situation. *See* Testimony of J. Hegarty, March 18, 1998, p. 25–27.

In summary, this Court finds that an oath was given to Detective Perry by Judge Hegarty over the telephone on December 23, 1996, as permitted under Michigan law and prior to the time Judge Hegarty signed the affidavit and issued the search warrant.

## 2. THE AFFIDAVIT SWORN TO BY DETECTIVE PERRY ON DECEMBER 23, 1996 IS NOT INVALID ON THE BASIS OF DEFENDANT'S CLAIM THAT IT CONTAINED FALSE OR MISLEADING ASSERTIONS OF MATERIAL FACT.

Defendant also argues that the search warrant is invalid because the affidavit in support thereof contained false or misleading assertions of material fact necessary to the finding of probable cause. The Court does not find any merit in this contention.

■ In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that a search based on a warrant that contains deliberately or recklessly false allegations is invalid unless the remaining portions of the affidavit provide probable cause. *Id.* at 155–56, 98 S.Ct. 2674; *see also United States v. Charles*, 138 F.3d 257 (6th Cir.1998). The Sixth Circuit has applied the *Franks v. Delaware* holding to conclude that "a court considering whether to suppress evidence based on an allegation that the underlying affidavit contained false statements must apply a two-part test: (1) whether the defendant has proven by a preponderance of the evidence that the affidavit contains deliberately or recklessly false statements *and* (2) whether the affidavit, without the false statements, provides the requisite probable cause to sustain the warrant." *Charles*, 138 F.3d at 263 (emphasis added); *see also United States v. Skinner*, 972 F.2d 171, 175 (7th Cir.1992).

■ Defendant maintains that the following assertions in the affidavit were deliberately or recklessly false:

1. Bottom of Page 1: "Affiant along with other officers from the Livingston County Sheriff's Department, the Michigan State Police and the Federal Alcohol and Tobacco and Firearms Division has been conducting an investigation relating to certain larceny and fraud crimes. . . ."

2. Bottom of Page 2: ". . . [T]he hay was unloaded and subsequently stacked in the airplane hanger structure. . . ."

3. Bottom of Page 2: "[A]ffiant has personally verified that numerous pine trees are in the vicinity on the premises."

4. Top of Page 3: "VanPatten noted that both Ronald Napoleon Wolfe and Ronald Nap Wolfe, Jr. were armed with automatic pistols at the time of the theft of the hay."

5. Top of Page 3: "Affiant has personally verified that Wolfe has livestock on the premises to be searched which utilize hay as part of their diet."

6. Middle of Page 3: "VanPatten indicated that Ronald Napoleon Wolfe, R Ronald Nap Wolfe, Jr., and Richard Herbert Culbert subsequently admitted that those materials had been stolen from the Byron Road construction site."

7. Top of Page 5: "Affiant has verified through serial numbers that the golf cart in Harp's possession was one of the two carts stolen from the Oak Pointe Golf Course on January 7, 1995."

8. Middle of Page 5: "VanPatten was provided a photograph of the pinto horse obtained from Jean Wainscott and VanPatten positively identified that horse as being one of the two in the stable during the time."

Defendant also claims that the following information was deliberately omitted from the affidavit in an effort to persuade the judge to issue the search warrant:

1. There was no allegation that Harp participated in the golf cart theft.

2. The affidavit did not state that Ms. Wainscott, the owner of the alleged stolen horses, had alerted the operator of the Michigan Horse Auction to

watch for her stolen horses after she discovered they were missing. The operators never contacted Ms. Wainscott to tell her that the horses were at the Auction.

This Court does not find that defendant has met his burden of showing by a preponderance of the evidence that *any* of these averments or omissions, even if false, were made deliberately or recklessly or were material to a finding of probable cause. First, defendant contends that the averment that the Bureau of ATF was conducting an investigation relating to larceny and fraud crimes was false because the ATF was not conducting such an investigation. Defendant maintains that only the Livingston County Sheriff's Department and the Michigan State Police were involved in such an investigation. This Court finds no purposeful or reckless falsity in that averment. At the evidentiary hearing, Allan Perry testified that during the investigation of larceny and fraud crimes, he learned that defendant possessed and carried weapons, and Perry made inquiries of Agent Evans of the Bureau of ATF regarding weapons. Also, Daniel Garber testified on February 23, 1998 in Livingston County Circuit Court that the ATF was giving advice to the Livingston County Sheriff's Department with respect to various firearms suspected to have been used in larceny and fraud crimes committed by the defendant and others. *See* Testimony of Daniel Garber, February 23, 1998, p. 83. Therefore, the Bureau of ATF was certainly *involved* in the investigation of various larceny and fraud crimes and, at least to a limited degree, was "conducting" an investigation relating to larceny and fraud crimes. In retrospect, perhaps the word "conducting" was not the most appropriate word to use in the affidavit. The word "involved" may have been more appropriate. However, there has been no showing that such a word choice was used in an attempt to mislead the judge. To the contrary, the error seems to be at most negligent.

Assuming *arguendo* that the assertions were deliberately or recklessly false, it would not upset a finding of probable cause that

defendant committed any of the crimes described therein or that the items to be searched for would be found on the premises. Such a representation was virtually immaterial to the affidavit. The fact of the matter is that other state agencies *were* investigating the defendant for larceny and fraud crimes, and this was made explicit in the affidavit.

Second, defendant asserts that the statement in the affidavit that "the hay was unloaded and subsequently stacked in the airplane hanger" was false. Defendant points out that the police report does not state that the hay was stacked in the airplane hanger. The Court finds that the statement in question was not false. Harold VanPatten testified that the hay was stacked a day after it was stolen and that he informed Perry of this. *See* Testimony of Harold VanPatten, March 6, 1998, p. 188.

Defendant also contends that the statements by Perry in the affidavit that he had "personally verified" that numerous pine trees were in the vicinity of the premises, and that he had also "personally verified" that the defendant had livestock on the premises were false. The Court finds no deliberate or reckless disregard for the truth in these averments. Perry testified that while he personally did not visit the premises and observe pine trees and livestock there prior to his signing of the affidavit, he was aware that there were pine trees on the premises because Roger Swackhammer had told him so and he was aware that there was livestock on the premises from interviews with William Harp and Harold VanPatten. Additionally, Perry testified at the evidentiary hearing that pine trees were seen during a "fly over" of the premises in which he participated and prior to the time the search warrant was signed.

Perry, in some sense, had verified that there were pine trees and livestock on the premises, although not personally, but through his conversations with others. Indeed, both Daniel Garber, the drafter of the affidavit, and Allan Perry, the affiant, testified that "personal verification" could mean the confirmation of a fact through speaking with others. *See* Testimony of Daniel Garber, February 23, 1998, p. 21; Testimony of

Allan Perry, February 10, 1998, p. 75. In hindsight, the words "personally verified" should not have been utilized. The important point is that this erroneous word choice was not done in a deliberate or reckless attempt to mislead. This Court finds no deliberate or reckless disregard for the truth in this averment.

Defendant also asserts that the averment regarding defendant's admission to VanPatten about a theft of building materials was deliberately or recklessly false. Defendant points to the March 6, 1998 testimony of Harold VanPatten that he never told Perry that defendant had admitted to him that he stole building materials from the Byron Road construction site. Harold VanPatten testified that only Ronald Wolfe, Jr. and Richard Culbert admitted to that theft. *See* Testimony of Harold VanPatten on March 6, 1998, p. 142. Based on the testimony of Harold Van-Patten, the averment regarding defendant's admission to the theft of building materials does appear to be incorrect. However, defendant has not shown that the averment was deliberately or recklessly made. Assuming *arguendo* that such a statement was deliberately or recklessly false, there still remains, when the offending statement is redacted, probable cause to believe that a theft of building materials occurred and that the building materials were on the defendant's premises.

Defendant also contends that another materially and deliberately false averment is that Perry verified through serial numbers that the golf cart in Harp's possession was one of the two carts stolen from the Oak Pointe Golf Course on January 7, 1995. At the hearing on August 24, 1998, the government conceded that this statement was erroneous. Perry was never able to make that correlation prior to the signing of the affidavit. *See* Testimony of Allan Perry, February 11, 1998, pp. 26–29; Testimony of Detective Robert Swackhammer, March 6, 1998, p. 22. Nevertheless, there has been no evidence that this erroneous assertion was made deliberately or with reckless disregard for the truth. The statement has been stipulated as erroneous, and it does not upset a finding of probable cause to believe that defendant participated in a theft of the golf carts.

Other information furnished in the affidavit provides ample basis for the finding of probable cause to believe defendant was involved in the theft of golf carts *and* that a golf cart would be on his premises. The affidavit provides the following assertions which, in and of themselves, satisfy the probable cause requirement, to wit: that the golf professional at Oak Pointe Golf Course reported a theft of golf carts; that Harp admitted to Perry that he and the defendant were involved in this crime; that Perry was provided a photograph by VanPatten of a golf cart on the defendant's premises; and that Robert Swackhammer observed the same.

Defendant contends that the affidavit's assertion that VanPatten had positively identified a photograph of a pinto horse, which photograph had been obtained from Jean Wainscott, was not true. Specifically, defendant takes issue with the affidavit's allegation that the source of the photograph was Ms. Wainscott. Defendant contends that the affidavit "filled in the blank" of the source of the photo, and that the source was unknown. The Court finds this argument unavailing. The source of the photograph is immaterial. What is material to the probable cause determination is that VanPatten was shown a photo of the stolen horses and positively identified the animals as being on defendant's property.

Defendant argues that the affidavit does not mention the fact that William Harp not only "observed" the theft of two golf carts by defendant and others, but also participated in the theft. In that regard, so the defendant asserts, the affidavit is false. The Court does not find the affidavit false for that reason. The affidavit clearly conveyed the fact that Harp participated in the theft. A finding that the affidavit is faulty based on its failure to use the word "participating" would amount to exactly the type of hypertechnical review which has been condemned by the Supreme Court. *See Illinois v. Gates,* 462 U.S. 213, 235–36, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (holding that "affidavits

for search warrants ... must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.... [W]hen a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner").

Defendant also complains that the affidavit contained another material omission, to wit: that the owner of the stolen horses, Ms. Wainscott, had alerted the operator of the Michigan Horse Auction to watch for her stolen horses, but no sighting of those horses was made at the auction. Defendant argues that this omission was critical to a finding of probable cause regarding the theft of horses, since the affidavit implied that defendant sold the horses in the Michigan Horse Auction on a Saturday. Defendant has not proffered any evidence showing that such an omission was deliberately or recklessly made in an effort to conceal the truth. Moreover, the Court does not find this omission material.

In summary, the Court does not find that defendant has met his burden of showing, by a preponderance of the evidence, that the affiant purposefully or recklessly inserted materially false statements in the affidavit. Alternatively, if all the statements which defendant asserts are deliberately and materially false are redacted from the affidavit, the Court still finds sufficient probable cause to believe that defendant committed the crimes to which those statements pertain and that evidence of those crimes would likely be found on defendant's premises.

### 3. THERE WAS PROBABLE CAUSE TO SEARCH DEFENDANT'S ENTIRE PREMISE BASED ON THE AFFIDAVIT.

Defendant also claims that the affidavit failed to set forth sufficient probable cause to believe evidence of a crime would be found on his premises and therefore the search of his premises was invalid. This argument is two-fold. First, defendant argues that the affidavit is not sufficient to support a finding of probable cause to search defendant's premises because it fails to provide the magistrate with *any* basis for evaluating the credibility of the informants, Harold VanPatten, Scott VanPatten and William Harp. Second, defendant argues that the affidavit is insufficient to support a finding of probable cause to search defendant's residence because the criminal acts alleged in the affidavit did not take place at defendant's residence and because there are no allegations in the search warrant that any stolen items, records and documents were ever seen in the defendant's residence.[2] These arguments will be addressed *seriatim.*

### STANDARD OF REVIEW

■ The Fourth Amendment to the United States Constitution states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation...." U.S. Const., Amdt. 4. Probable cause to search has been defined as a "fair probability" that contraband or other evidence of a crime will be found at the place to be searched. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See also United States v. Savoca,* 761 F.2d 292, 297 (6th Cir.1985) (holding that the "critical element in a reasonable search ... is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought") (*citing Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), *cert. denied,* 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985)); *United States v. Lockett,* 674 F.2d 843 (11th Cir.1982) (holding that

---

**2.** The issue of whether the affidavit provided Judge Hegarty with probable cause to believe that contraband or evidence of crimes would be found at the defendant's residence is crucial to

the analysis of whether the officers had authority to seize the weapons from defendant's gun vault under the plain view doctrine. The issue of plain view will be discussed *infra.*

the evidence was insufficient to support a finding of probable cause to search for dynamite on defendant's property without some showing that dynamite was being stored there).

Probable cause is assessed in light of the "totality of circumstances." *Gates,* 462 U.S. at 238, 103 S.Ct. 2317. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* A reviewing court should *not* examine *de novo* the sufficiency of an affidavit supporting a warrant. *Id.* at 236, 103 S.Ct. 2317. Rather, "the traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a 'substantial basis ... for conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *United States v. Pelham,* 801 F.2d 875, 878 (6th Cir.) (quoting *Gates,* 462 U.S. at 236, 103 S.Ct. 2317), *cert. denied* 479 U.S. 1092, 107 S.Ct. 1305, 94 L.Ed.2d 160 (1987). The reviewing court should pay great deference to a magistrate's probable cause determination and should not set aside a magistrate's finding of probable cause unless it is "arbitrary." *United States v. Weaver,* 99 F.3d 1372, 1377 (6th Cir.1996); see also *Massachusetts v. Upton,* 466 U.S. 727, 732–33, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984); *United States v. Pelham,* 801 F.2d at 877 (*citing United States v. Swihart,* 554 F.2d 264, 270 (6th Cir.1977)). In doubtful or marginal cases, the reviewing court should uphold the magistrate's finding. *Lockett,* 674 F.2d at 845. The rationale for this deference stems from a preference for the search warrant process over warrantless searches. *Id.*

In *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court rejected the strict, two-pronged probable cause test established in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). That test required that a search warrant affidavit based on an informant's tip contain information regarding the "reliability or credibility" of the informant and the "basis in knowledge" of his or her tip. In *Gates,* the Supreme Court explained that while these elements " 'may usefully illuminate the commonsense, practical question of whether there is "probable cause" to believe that contraband or evidence is located in a particular place,' they should not be '[understood as entirely separate and independent requirements to be] rigidly exacted in every case....' " *United States v. Pelham,* 801 F.2d 875, 877 (6th Cir.1986) (*quoting Gates,* 462 U.S. at 230, 103 S.Ct. 2317). *Gates* established that courts must apply a "totality of the circumstances" approach in determining the existence of probable cause. *See id.* "Probable cause is a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.' " *Id.* at 230–231, 103 S.Ct. 2317 (*quoting Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).

## *ANALYSIS*

Under the standard articulated in *Gates,* this Court finds that Judge Hegarty had a sufficient basis for finding probable cause to believe that defendant had been involved in numerous crimes and that the items described in the warrant would be found on defendant's premises. First, this Court finds that Judge Hegarty was given ample information from which to determine that informants William Harp and Harold VanPatten were credible. These informants identified themselves to the authorities which lends some credence to their accounts. In general, information provided by a named informant is inherently less suspect than that provided by an anonymous tip. *See Pelham,* 801 F.2d at 878 (holding that information contained in an affidavit provided a substantial basis for the magistrate to find probable cause, in part because affidavit was based on statements of a named informant).

In addition, the affidavit sets forth the basis of William Harp's and Harold VanPat-

ten's knowledge, describing them as "past associates and acquaintances of the [defendant]" who had "repeatedly" over the past several years been on the searched premises. *See* Affidavit for Search Warrant, p. 2. The defendants also participated in some thefts with the defendant. Indeed, the informants' admissions to the thefts lends credence to their information. *See United States v. Golay,* 502 F.2d 182, 186 (8th Cir.1974) (holding that "the credibility and reliability of the informant was adequately established by the disclosure in the affidavit that the informant was an admitted participant in the crime and therefore an eyewitness to most of the acts constituting the crime as described in the affidavit"). Moreover, William Harp and Harold VanPatten provided very detailed information, which tends to substantiate their information. *See Gates,* 462 U.S. at 234, 103 S.Ct. 2317 (holding that an "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitled [the informant's tip] to greater weight than might otherwise be the case").

Another factor supporting the credibility of the tips made by William Harp and Harold VanPatten is the fact that those tips were corroborated to some degree by independent police investigation. For instance, the account by Harold VanPatten of the hay theft was corroborated by the investigating deputy who located wagon tracks in the field from which the hay was stolen heading in the direction of defendant's premises. Also, pine trees were confirmed to be on the defendant's premises, which corroborated VanPatten's description of the premises. The description of the construction material thefts provided by VanPatten matched the dates specified in the Livingston County Sheriff's Department's reports. Additionally, the thefts of the golf carts were corroborated, to some degree, by Sgt. Swackhammer's observation of a golf cart on the Wolfe premises. Finally, William Harp and Scott and Harold VanPatten corroborated one another. William Harp and Harold VanPatten both described a different theft in which they participated with the defendant late in the evening, which suggests a *modus operandi* of the defendant. Both William Harp and Harold

VanPatten stated that defendant commonly carried handguns. Moreover, William Harp and Harold VanPatten stated that windows were delivered to the Wolfe premises in a piecemeal fashion by Ronald Napoleon Wolfe.

The instant case stands in marked contrast to *United States v. Weaver,* 99 F.3d 1372 (6th Cir.1996). In that case, the Court found that the affidavit supporting the warrant did not provide the requisite probable cause that a search of the defendant's premises would uncover evidence of wrongdoing. *Id.* at 1379–80. The only claim of possible wrongdoing was the averment that "within three days prior to the affidavit date, the informant was on the suspect premises and while there, he saw some quantity of marijuana 'expressly for the purpose of lawful distribution.'" *Weaver,* 99 F.3d at 1378. The only independent corroboration conducted by the officers was to verify the suspect's name, address, and description of the residence. In the instant case, more investigation was conducted by the authorities. The two informants corroborated each other. The informants provided their names, and they implicated themselves in criminal acts.

Defendant argues that the magistrate was not informed of one very important fact which purportedly detracts from the credibility of these two informants, to wit: that they had been given immunity by Prosecutor Garber. The Court does not find this fatal to the probable cause determination. William Harp testified that he first implicated himself in criminal activity on December 6, 1996, when he spoke with Allan Perry. He was not promised immunity, however, until December 10, 1996. *See* Testimony of William Harp, March 6, 1998, p. 32. In addition, the immunity in and of itself would not necessarily negate the value of the information furnished by these two individuals.

■ A closer question is whether Judge Hegarty had sufficient information from which he could assess the reliability of Scott VanPatten. If Judge Hegarty had no basis for finding Scott VanPatten reliable, then there was no substantial basis for finding that an insurance fraud had been committed.

The affidavit states that Scott VanPatten, Harold VanPatten's brother, told Perry that defendant had admitted to making an insurance claim and recovering money for "stolen windows." Without Scott VanPatten's statement, all that the affidavit reveals is that windows were stored at William Harp's house and were removed piecemeal by Ronald Wolfe Jr. and that VanPatten noted that defendant's house, then under construction, had been framed and ready for windows but they were delivered piecemeal by Ronald Wolfe Jr. Under the "totality of the circumstances," this Court finds that Judge Hegarty had probable cause to believe an insurance fraud had been committed. The storage of windows at Harp's residence at a time when the building under construction was ready for their installation and the delivery of those windows in a piecemeal fashion to defendant's premises are suspicious circumstances. Thus, Scott VanPatten's statement appears credible. Additionally, it is implied in the affidavit that Scott VanPatten spoke with defendant. As Scott VanPatten is identified as a brother to Harold VanPatten, and since Harold VanPatten is a close acquaintance to defendant, it is very plausible that Scott VanPatten is also acquainted with defendant.

■ Defendant also contends that the magistrate did not have a substantial basis to believe that evidence of the crimes would be *in defendant's residence,* as opposed to other buildings on his property, since the affidavit sets forth no facts that the stolen goods or documents in question *had been seen* in the residence. The Court is not persuaded. First, this argument rests on the faulty proposition that before there can be probable cause to search a place, one must directly observe the item to be searched for at the premises. It is well-settled that "the nexus between the objects to be seized and the premises to be searched can be established from the particular circumstances involved and *need not rest on direct observation.*" *United States v. Jenkins,* 901 F.2d 1075, 1080 (11th Cir.1990) (emphasis added) (*quoting United States v. Lockett,* 674 F.2d 843, 846 (11th Cir.1982)).

In light of *United States v. Jenkins,* this Court finds that the affidavit provided proba-ble cause to search the residence. First, the affidavit established probable cause to believe defendant resided at the premises to be searched and had been involved in numerous crimes, including a theft of building materials and horses. Thus, a search for "records relating to building materials for the structures or premises" and "records relating to horse ownership, sales or veterinary treatment" would certainly be justified. *See, e.g., United States v. Hargus,* 128 F.3d 1358 (1997) (holding that "receipts and other records" described in the search warrant would be found at defendant's house and that "there need not be direct evidence or personal knowledge" that the items sought are located at the place to be searched); *United States v. Reed,* 726 F.2d 339 (7th Cir.1984) (holding that because there was probable cause to believe crimes were committed and because documents and records of those crimes were most likely to be in the home, and since the records were needed to corroborate crimes, the search of the home was valid); *United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir.1970) (holding that "[t]he situation does not differ markedly from other cases wherein this court and others, albeit usually without discussion, have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property").

Second, the affidavit stated that many of the items stolen were kept in outbuildings on the premises. Thus, evidence of ownership or occupancy of these outbuildings (where the stolen goods were expected to be found) clearly would be important evidence of defendant's complicity in the thefts; indeed, without such evidence recovery of the stolen goods would hardly incriminate him. The most logical place in which such records would be stored would be the defendant's residence. *See United States v. Whitten,* 706 F.2d 1000 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984) (upholding a search for records of

ownership where multiple defendants were suspected of having utilized the premises as a headquarters for large scale drug operations); *United States v. Crozier*, 777 F.2d 1376, 1380–81 (9th Cir.1985) (upholding a search of "any indicia of ownership and control of the premises").

For the reasons discussed above, this Court finds that the affidavit set forth probable cause to believe an insurance fraud had been committed by defendant. Therefore, a search of the defendant's residence for "insurance records, claims forms and payment forms" was justified. The most logical place for those records and forms would be in defendant's residence.

## 4. EVEN IF THE AFFIDAVIT DOES NOT ESTABLISH PROBABLE CAUSE, THE GOOD FAITH EXCEPTION TO THE WARRANT REQUIREMENT IS APPLICABLE TO VALIDATE THE SEARCH IN THE CASE AT BAR.

■■■ The government argues that *even if* the affidavit does not establish probable cause for the search, the good faith exception to the exclusionary rule applies to validate the search of the premises, including the residence. See *United States v. Leon*, 468 U.S. 897, 920–21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), *reh'g denied*, 468 U.S. 1250, 105 S.Ct. 52, 82 L.Ed.2d 942 (1984). Under the good faith exception, set forth by the Supreme Court in *United States v. Leon*, exclusion of evidence is improper when the officers acted in objective, good faith reliance on a facially-valid warrant. *See id.* There are three specific situations, however, where the good faith reliance exception does not apply:

1. If the warrant is based on a knowing or a reckless falsehood contained in the supporting affidavit.

2. If the magistrate was acting as a mere rubber-stamp for the police, *or*

3. If the information contained in the affidavit did not add up to probable cause and the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

*United States v. Savoca*, 761 F.2d 292, 296 (6th Cir.), *cert. denied*, 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985).

■■■ In the instant case, this Court finds that the good faith exception applies. The officers executed the warrant, from an objective standpoint, in reasonable reliance on a facially valid warrant. Defendant contends that the exception does not apply since Judge Hegarty was a mere "rubber-stamp" for the police. Defendant points out that Judge Hegarty issued the search warrant after reviewing the affidavit for only five minutes. Judge Hegarty testified in Livingston County Circuit Court on March 18, 1998 as follows:

> A. At 7:10 I would have signed and dated and time [the affidavit] and would have read it. And after reading it, I woulda then signed the warrant. After I found good cause.

> Q. And the 7:15 a.m. on the search warrant would be representative of what, sir?

> A. The time after I read the affidavit, found good cause and decided to sign the search warrant.

Testimony of Judge Hegarty, March 18, 1998 at p. 29–30. This Court does not find that Judge Hegarty acted as a so-called "rubber stamp" for the police for the following reasons. The alleged five-minute review of the warrant does not *per se* invalidate the judge's probable cause determination. It is certainly possible that Judge Hegarty could have reviewed a six-page document in five minutes. Additionally, Judge Hegarty admitted that the five minute time-span was an approximate span of time. He testified that he had read the affidavit in five minutes "give or take." *See* Testimony of Judge Hegarty, March 18, 1998 at p. 30.

Furthermore, the facts presented in the case at bar are not analogous to other situations in which courts have found the "rubber stamp" exception applicable. See, e.g. *United States v. Wilhelm*, 80 F.3d 116, 121–22 (4th Cir.1996). In *Wilhelm*, the Fourth Circuit held that the magistrate had acted as a mere "rubber stamp" for the police in approving a "bare bones affidavit," one that contained "wholly conclusory statements which lacks the facts and circumstances from

which the magistrate can independently determine probable cause." *Id.* at 121 (*quoting United States v. Laury,* 985 F.2d 1293, 1311 n. 23 (5th Cir.1993)). The affidavit at issue in that case provided no meaningful corroboration, and merely described telephone conversations with a "concerned citizen." *Id.* The affidavit in the case at bar certainly cannot be described as "bare bones." There is no evidence that Judge Hegarty "wholly abandoned his judicial role" merely by reading the affidavit quickly. *See Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 326–27, 99 S.Ct. 2319, 60 L.Ed.2d 920 (holding that a town justice who had participated in search of an adult bookstore had failed to demonstrate the required neutrality and detachment).

Therefore, this Court concludes that Judge Hegarty was not acting as a mere "rubber stamp" for the police. The good faith exception applies, so that even if the warrant were to be found invalid, the police would be justified in their reliance on it.

### 5. WHETHER THE DEFENDANT CONSENTED TO A SEARCH OF THE VAULT IS MOOT.

In his brief in support of his motion to suppress, defendant argues that he did not consent to the search of his vault. This argument, however, is moot because the government has never alleged, nor does it intend to allege, that the search of the vault was authorized by defendant's consent.

### 6. SEIZURE OF THE FIREARMS IS VALID UNDER THE PLAIN VIEW EXCEPTION TO THE WARRANT REQUIREMENT.

 The warrant at issue does not authorize the police to search for and seize firearms. Thus, unless an exception to the warrant requirement applies, the weapons must be suppressed at defendant's trial because their seizure was beyond the scope of the warrant. The government argues that the seizure of these items is valid under the plain view exception to the warrant requirement. That exception applies if the following requirements are met:

1. the firearms were in plain view;

2. the incriminating character of the firearms was immediately apparent, and

3. the firearms were viewed by an officer lawfully located in a place from where the object can be seen and seized by an officer who has a lawful right of access to the object itself.[3]

*See Horton v. California,* 496 U.S. 128, 142, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). It is uncontested that the items were in "plain view," and this Court has determined that the firearms were viewed by officers who were lawfully present. Therefore, the crucial issue becomes whether the "immediately apparent" requirement has been satisfied. The Supreme Court has equated "immediately apparent" with "probable cause." *Texas v. Brown,* 460 U.S. 730, 741, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). It does *not* mean, as defendant argues, that a police officer "knows" that certain items are contraband or evidence of a crime. *Id.* Rather, it means that the officer must have "probable cause to associate the property with criminal activity." *Id.* at 741–42, 103 S.Ct. 1535. (*quoting Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). Indeed, the Supreme Court has recognized that "the

---

3. As this Court has already determined, the affidavit gave Judge Hegarty a substantial basis for finding probable cause to believe various items described in the warrant would be at defendant's residence. Thus, the search of the residence was constitutional. More specifically, the search of the gun vault was constitutional since it is conceivable that the items described in the warrant would be located in the gun vault. *See* Testimony of Allan Perry, February 9, 1998, p. 84, wherein Perry states that he was searching for items authorized by the warrant in the gun vault.

Assuming *arguendo* that the warrant was *invalid* as to the search of the residence, but that the Leon decision's good faith exception is applicable, this Court would still find that the officers were lawfully searching the defendant's residence for purposes of the plain view doctrine. *See United States v. Legg,* 18 F.3d 240, 244 (4th Cir.1994) (holding that "the rationale of *Leon* should apply to render an officer lawfully present for purposes of applying the plain view doctrine...."); *see also United States v. Owen,* 621 F.Supp. 1498, 1508–1509 (E.D.Mich.1985) (finding officers lawfully present for purposes of the plain view doctrine if *Leon* is applicable).

phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Id.*

In light of the clarification of the "immediately apparent" prong in *Texas v. Brown,* this Court finds that Perry had probable cause to link the weapons in the gun vault with criminal activity. This conclusion is further supported by a number of factors. First, Perry testified that he had no intention of seizing weapons during the search. It was only after he discovered the weapons in the gun vault that he determined there was probable cause to seize them. The circumstances under which the guns were found gave Perry probable cause to believe they were contraband. *See* Testimony of Allan Perry, February 11, 1998, p. 217.

The government's position is strengthened by its citation of M.C.L. § 750.227(b), "Possession of firearm at time of commission or attempted commission of felony." The government persuasively argues that the firearms were lawfully seized because defendant, by placing the guns in a hidden vault *next to* growing marijuana plants, was in violation of M.C.L. § 750.227(b). That section provides, in pertinent part, that "[a] person who carries or has in his or her possession a firearm when he or she commits or attempts to commit a felony ... is guilty of a felony, and shall be imprisoned for 2 years." M.C.L. § 750.227(b)(1). Since defendant was feloniously growing marijuana and the firearms were "in his possession" during the commission of that offense, the police had independent grounds for lawfully seizing the firearms. *See* id.; *see also United States v. Meyer,* 827 F.2d 943 (3d Cir.1987) (watches found in a crawl space during a search at a jewelry store for stolen items after owner was asked, but could not produce, evidence of ownership, were properly seized under plain view exception). In addition, among the firearms were silencers and sawed-off rifles, the legal possession of which are so rare that the Sixth Circuit has held that there is probable cause justifying their plain view seizure. *See United States v. Poulos,* 895 F.2d 1113, 1122

(6th Cir.1990) (holding that a properly registered silencer is "intrinsically suspicious" and its incriminating nature "immediately apparent"); *United States v. Weinbender,* 109 F.3d 1327 (8th Cir.1997) (holding that while executing a search warrant for clothing; officer found home-made silencer, the seizure of which was proper because possession of a silencer is "illegal"); *United States v. Wickizer,* 633 F.2d 900, 902 (6th Cir.1980) (holding that short-barreled rifles were "obviously contraband" and properly seized when found in plain view); *United States v. Truitt,* 521 F.2d 1174 (6th Cir.1975) (holding that probable cause justifying seizure of a sawed-off shotgun was "immediately apparent" from the particular nature of the object).

It is also significant that Perry had been informed that defendant used weapons when committing thefts. Elsewhere on the premises were extensive evidence of such thefts, as well as seven police uniform shirts, three police uniform pants, a police jacket and a police badge with defendant's name, furthering a finding of probable cause to believe the weapons in the vault were associated with criminal activity. *See United States v. Buckley,* 4 F.3d 552, 557 (7th Cir.1993) (holding that officers properly seized weapons in plain view when they knew at the time they executed the warrant that the defendant was a previous felon); *United States v. Jefferson,* 714 F.2d 689, 695 (7th Cir.1983) (holding that "circumstances reasonably alerted the officers to the possibility that the items were fruits of another illegal activity"); *United States v. Golay,* 502 F.2d 182 (8th Cir.1974) (holding that "the circumstances presented ... would have 'reasonably alerted the police officers to the fact that [the defendant] may have been involved in some other illegal activity,' the fruits of which were before them"). Given all the circumstances under which the firearms were found, including defendant's violation of M.C.L. § 750.227(b), this Court finds that the weapons' incriminating nature was "immediately apparent" to the officers.

Defendant attempts to analogize the instant case to *United States v. Szymkowiak,* 727 F.2d 95 (6th Cir.1984), wherein the court found the plain view exception inapplicable

because the objects seized were not "immediately apparent." *Id.* at 98–99. In *Szymkowiak,* police officers obtained a search warrant authorizing a search of defendant's apartment for jewelry and a television set. *See id.* at 96. During the search, the officers found an AR–15 weapon near a couch within the apartment. *See id.* The agents could not tell whether the gun was illegal, so they called a federal ATF agent to the scene. The ATF agent told the executing officers that the weapon did not violate federal law, but that it "probably" violated state law. The officers seized the weapon and further examination of it resulted in a federal charge being filed against the defendant. The *Szymkowiak* court found that seizure of the AR–15 could not be justified under the plain view exception and suppressed the same. *See id.* at 99. The court stated:

> ... we conclude that the executing officers' probable cause to connect the seized weapon with criminal activity was neither "immediate" or "apparent." The incriminating nature of the evidence seized was at no time "apparent" to the seizing officers or agents. We note initially that no "nexus" whatsoever exists between the seized weapon and the items particularized on the search warrant. *See United States v. Gray,* 484 F.2d 352, 355 (6th Cir.1973), *cert. denied,* 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974).[4] Further, our review of the record indicates that even ATF agent Haverstick did not have probable cause to believe from the *intrinsic nature* of the seized weapon that the evidence was incriminating. Haverstick, a firearms expert, testified that he believed that possession of such a weapon was not a federal offense. He also stated that he could not determine from the exterior of the weapon whether its possession violated Ohio law. The possession of an automatic firearm in Ohio violated O.R.C. § 2923.17. But Agent Haverstick testified that he "could not say

*at the time"* that he examined the weapon whether it was an automatic firearm. (Transcript p. 65). He further testified that he could not determine from his examination of the evidence whether it was specifically adapted for automatic performance. (Transcript pp. 77–80). After Haverstick's expert examination of the seized weapon, he was able to determine that the firearm's possession was not violative of federal law and was not able to determine that its possession violated Ohio law.

*Id.* at 98–99.

The instant case is distinguishable from *Szymkowiak.* In *Szymkowiak,* there was no apparent nexus between the crimes for which the premises was being searched, i.e., theft of jewelry and a television set, and the AR–15. In the case at bar, unlike the situation in *Szymkowiak,* firearms were reported to have been used during the crimes under investigation. Thus, there was an apparent nexus between the crimes for which the premises was being searched and the weapons discovered. The affidavit states that the officers had been told the defendant (and his son) "were armed with automatic pistols at the time of [one such] theft." Additionally, in *Szymkowiak,* the ATF agent who was summoned to the scene determined that the weapons were *not* illegal. Here, when Perry called Prosecutor Garber, he was informed that the weapons *should be seized.*

▉ Defendant further attempts to argue that the officers conducting the search *knew* that defendant was a federally licensed firearms dealer and thus the police *could not have known* at the time of their discovery if the weapons seized were legal or illegal. This reliance on Detective Perry's subjective state of mind to invalidate the plain view exception is misguided in light of case law holding that a police officer's actual state of

---

4. In *United States v. Gray,* 484 F.2d 352, (6th Cir.1973), the Sixth Circuit found unconstitutional the seizure of rifles. In that case, the officers inadvertently discovered rifles while executing a search warrant for alcoholic beverages. The officers copied down the serial numbers, left the defendant's premises, ran the information taken off the rifles through the National Crime Information Center, and then obtained a warrant for the search and seizure of the rifles. The Sixth Circuit found the plain view exception inapplicable to seizure of the rifles since the incriminating nature of the rifles was not apparent to the officers when they first discovered them. *See id.* at 355.

mind when executing a search warrant is irrelevant.[5] *See United States v. Kalter,* 5 F.3d 1166 (8th Cir.1993); *United States v. Hatten,* 68 F.3d 257 (8th Cir.1995); *United States v. Willis,* 37 F.3d 313 (7th Cir.1994). In *United States v. Kalter,* the Eighth Circuit held that probable cause is determined under an objective standard, and not by reference to the subjective reasons in police officers' minds which motivated defendant's arrest. *See* 5 F.3d at 1168. In *Kalter,* officers stopped defendant's vehicle because he was driving at night without lights. *See id.* The officers subsequently observed a handgun laying on the back seat of the automobile and arrested defendant because they *believed* he had violated a Missouri statute. *See id.* (*citing* Mo.Rev.Stat. § 571.303.1(1)). In actuality, Kalter had not violated that statute because the gun was not concealed. Nevertheless, the court stated:

> How Officers Risk and Winter interpreted the law is not, in any event, dispositive of the question whether they had probable cause to arrest Kalter. We need not determine how these officers concluded that they had probable cause to arrest Kalter. We ask instead whether a prudent person, who knew about the St. Louis ordinance and who observed what these officers saw, could have believed that Kalter had committed or was committing a crime at the time of his arrest. *See, e.g., United States v. Slupe,* 692 F.2d 1183 (8th Cir.1982). It is obvious that a reasonable person could have believed Kalter had violated the St. Louis ordinance by transporting a gun, not enclosed in a case or its original packaging, in the back seat of his vehicle. The facts known to Officers Risk and Winter at the time of Kalter's arrest therefore constituted probable cause to arrest him. We therefore affirm the district court's decision not to suppress the gun recovered incident to the arrest.

*Id.* The objective standard is applied consistently in cases where police officers, though mistaken or unsure of the precise law being violated, nonetheless were found to have had sufficient probable cause to effectuate an arrest or to seize evidence in plain view. *See United States v. Willis,* 37 F.3d 313, 316 (7th Cir.1994) (holding that seizure of gun in plain view was justified because officer *could* determine that defendant had *probably* violated federal statute prohibiting guns on school property as soon as officer identified glint of handgun); *see also United States v. Hatten,* 68 F.3d 257, 261 (8th Cir.1995) (holding that " [p]robable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a *reasonably cautious man* would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime' ").

Defendant further argues that the plain view exception is invalid because Detective Perry could not have known that the pen guns specifically were illegal upon surface inspection. This argument is flawed for the same reasons as stated above. "Immediately apparent" does not mean the police officer "knows" or "is certain" that the item is evidence of an illegal nature. Rather, it means that the officer must have "probable cause to associate the property with criminal activity." *Brown,* 460 U.S. at 741–42, 103 S.Ct. 1535. Perry had probable cause to believe the pen guns were illegal, given their proximity to other facially suspect items, such as the sawed-off shotguns and silencers. Additionally, as discussed above, a police officer's actual state of mind when executing a search warrant is irrelevant. *See United States v. Kalter,* 5 F.3d 1166 (8th Cir.1993); *United States v. Hatten,* 68 F.3d 257 (8th Cir.1995); *United States v. Willis,* 37 F.3d 313 (7th Cir.1994).

In light of the foregoing, this Court finds that the plain view doctrine is applicable in the case at bar, allowing an exception to the

---

**5.** Even if the court were to consider the officers' subjective state of mind, the following factors weigh heavily against a finding that the officers were unjustified in their conclusion that the firearms were illegal. First, defendant's firearm business was 60 miles away in the Detroit area. Second, during the search, the officers found receipts for only twelve guns, and thus had probable cause for believing the remaining guns were illegal. Third, although not revealed in the affidavit, the officers had received several reports of automatic gunfire on the premises. Fourth, the circumstances under which the guns were found led the officers to conclude at the time of their discovery that the weapons were connected with criminal activity. *See* M.C.L. § 750.227(b).

warrant requirement with respect to the items seized in the vault.

### 7. *M.C.L. § 780.656 WAS NOT VIOLATED.*

█ Defendant further argues that the officers violated Section 780.656 of Michigan Compiled Laws, "Breaking of doors and windows," when they entered the gun vault. That section provides in full:

> The officer to whom a warrant is directed, or any person assisting him, may break any outer or inner door or window of a house or building, or anything therein, in order to execute the warrant, if, after notice of his authority and purpose, he is refused admittance, or when necessary to liberate himself or any person assisting him in execution of the warrant.

M.C.L. § 780.656. Defendant attempts to argue that the officers did not give notice of their authority and purpose before opening the gun vault. However, Detective Perry testified that he provided Marie Wolfe with a copy of the search warrant prior to entering the vault. Perry also stated that he went into the vault to look for items described in detail in the search warrant. Thus, this Court finds that the detective did give notice of his authority and purpose for entering the vault prior to his entering therein.

Although no Michigan case specifically addresses "knocking and announcing" at an *inner* door, there is case law dealing with this issue in the context of 18 U.S.C. § 3109, the federal counterpart to M.C.L. § 780.656. The federal statute provides in full:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109. Cases interpreting this federal statute are instructive, and shed light on the "inner door" issue presented in the case at bar.

In *United States v. Johnson,* 573 F.Supp. 998 (D.Kan.1983), the court held that "[o]nce law enforcement officers lawfully enter a house, they need not comply with the knock and announce statute before entering every other closed door within residence." *Id.* at 1000 (interpreting 18 U.S.C. § 3109); *see United States v. Crawford,* 657 F.2d 1041 (9th Cir.1981) (holding that announcement of authority and purpose at front door was sufficient to meet knock and announce requirement, refuting any duty to repeat notice at inner bedroom door). In the instant case, this Court has already found that Detective Perry had given notice of his authority and purpose to Marie Wolfe upon entering the residence and prior to entering the vault. The issue thus becomes whether Perry was required to *again* "knock and announce" at the vault door. It is clear from the federal case precedents that Perry was not required to "re-announce" at the entrance to the vault. A contrary finding would lead to ludicrous results. Police officers would be unnecessarily hampered in performing lawful searches if required to *repeatedly* give "notice of authority and purpose" upon entering any closed inner door inside the residence. Neither the Michigan statute nor its federal counterpart requires such repetition. *See United States v. Bragg,* 138 F.3d 1194 (7th Cir.1998) (holding that § 3109 applies "per house rather than per door"). Thus, there was no violation of M.C.L. § 780.656.

NOW, THEREFORE, IT IS HEREBY ORDERED that defendant's motion to suppress fruits of a state search warrant is **DENIED.**

**SO ORDERED.**